InterQuest v. Young Life, No. 17-1581. Mr. Boyd? Good to have you here, Mr. Boyd. Thank you, Judge King. May it please the Court, the contract in question here for the sale of the three-person giant swing by InterQuest to Young Life for installation at its Pickens County Camp of Carolina Point was a contract primarily for the sale of goods and not primarily for the provision of services, and therefore the South Carolina Uniform Commercial Code should have been applied rather than the Lex Loci Contractus. And South Carolina law authorizes the indemnity claim by InterQuest in this case, and instead of granting summary judgment in favor of Young Life, the district court should have granted summary judgment in favor of InterQuest. The mere fact that there was some installation involved in the sale of the swing, which of course had to be installed at the camp, is not, of course, determinative, and rather it is the predominant factor test that the courts use. Wasn't this more akin to a construction agreement or contract? It's just a gathering of these materials and a design by the supplier in this case and then constructing it, and doesn't that suggest that it's predominantly a services agreement? Judge Diaz, I would disagree with that, and we believe that the contract was for the sale of a swing. Young Life was buying the completed swing. Certainly some installation or construction-like services were involved, but the predominant aspect of this transaction was the sale of the swing. The lawsuit against InterQuest involved the design and manufacture of an allegedly defective three-person giant swing. There was no issue about installation in this case, and the installation, we believe, was simply incidental to the sale of the swing because it had to be installed at Carolina Point Camp in Pickens County. If you look at the tests that are used by the court, none of which, of course, are determinative, we believe all of that points to this being predominantly a sale of goods rather than only incidentally a provision of services. So in this case, you agree that the contract was formed in North Carolina? The contract was signed in North Carolina without question. There's no dispute about that. So the real fight is under North Carolina law, the notification clause is against public policy, but in South Carolina, under the Uniform Commercial Code, you could have such an indemnification clause. Is that the gist of the suit? That's correct, although alternatively, even if the UCC doesn't control under South Carolina law, we believe under the circumstances of this case, our court in South Carolina may not apply the Lex Loci contract even though the contract was signed in North Carolina and would apply the restatement second of contracts where many, many states are moving away from Lex Loci contractors for the simple reason that obviously under the facts of this case, North Carolina has no interest whatsoever in this case. The swing was installed in South Carolina. The accident occurred in South Carolina. The underlying lawsuit was filed in South Carolina. North Carolina statute simply should not apply, and under our argument that the UCC of South Carolina does apply, obviously North Carolina's law would not apply. It's significant to note that in most cases where there is a mixed component to these contracts, the courts rule in favor of the sale of goods, and Judge Deas, to your question, despite bone break versus Cox and plantation shutters in South Carolina and the TV tower case, Klein, Iron and Steel, all of which involve a substantial component of installation, the courts rule that those were sales of goods, not services contracts. Now, it is true, as pointed out by Young Life, that InterQuest does have a contractor's license. They have to have one to do this incidental construction work that is necessary at the site to install the swings, but the division of InterQuest, which is involved here, primarily designs, manufactures, sells and installs three-person giant swings and other challenge course equipment, just like the three-person giant swing involved here. And needless to say, what Young Life wanted out of this contract was a completed three-person giant swing that they could use at the camp. And in the contract itself, it does refer to Young Life is buying the swing. They are the buyer, which is held by many courts to be important language. Young Life wanted to make sure that the design of the swing remained with it, and it's very, we think, consistent with all of the case law that this is a contract for the sale of goods. The Klein, Iron and Steel company case, we think, is particularly instructive. In that case, of course, as the court knows, the court noted that the price of virtually every product sold includes charges for services such as installation, and the cost of these services should be characterized as part of the cost of the goods. And as that case noted, the cost of installation was enormous. It was a tremendous expense factor. But nevertheless, what the court determined was at stake was the sale of a television steel tower. The only evidence we have, the contract, of course, provided for a lump sum, $36,000 for the cost of the swing. There is some email correspondence in the record between Randy Smith of InterQuest and Bruce Johnson of Young Life with some breakdown, but the only breakdown given there indicates that the components far exceeded the cost of installation. There's a $21,250 number for parts and installation plus an $11,000 figure for the cost of the poles. So that gives you $32,000 of the $36,000 cost of the swing. Indicative, we think that installation was only a relatively minor component of this contract, and the speculation by Young Life, which the district court also adopted, we don't believe is supported by the evidence in the record. I thought the district court found that, or at least found some evidence, that the cost of the swings material was no more than $12,000. Is that not right? That is what the district court determined. However, there's nothing to support that that we can see in the record. That's clearly erroneous? As far as I can determine, Judge King, I mean, again, the only breakdown we have, the only thing that's in the record is $21,250 for parts and installation. In addition to that, there was a cost for the poles of $11,900, and then there was some miscellaneous costs that brought it up to $36,000 some odd. I don't see where you get anything other than that out of the record. And again, we think the district court and Young Life are speculating about the other breakdown, which simply wasn't made by the parties. Well, the contract did say design, planning, construction, alteration, repair, or maintenance. And so the alteration, repair, or maintenance, doesn't that put it in the service box? Well, that's a standard form contract that I think InterQuest uses for a variety of applications. In this case, the only thing InterQuest was doing was installing the swing. We were not responsible for anything after that. They used the services of a different company, Adventure Experiences, to train the operators and to inspect the swing and to do whatever. And I guess Young Life was doing its own maintenance. We weren't doing any further work. Our work was complete at the time we installed the swing at Carolina Point. We had no further obligation after that. For those reasons, we believe that the district court was in error in applying North Carolina law to the construction of the indemnity agreement. If North Carolina law applies, you lose? No, Judge King. As we argued in our brief, as an alternative, even if this court determines, as did the district court, that it's not governed by the South Carolina UCC, we believe under the circumstances here that the South Carolina court would not apply Lex Loci Contractors to a case where the only contact with the case is the mere happenstance. But if North Carolina law applies, do you lose? Yes, sir. That's all my question. I'm sorry, I misunderstood. The whole thing turns on that question. That's correct. The whole case turns on whether North Carolina or South Carolina law applies. That is correct. If North Carolina law applies, you lose. That is correct. And you say if South Carolina law applies and you say it should apply, you win. That is correct. And it's really that simple. Now, obviously, the threshold determination is whether this is a contract for the sale of goods or a contract for provision of services. And having correctly decided that, we believe the district court should have applied South Carolina UCC law and South Carolina would then apply, which validates our indemnity claim. Let me touch on, I see I'm about to run out of time, let me touch just a minute on the equitable indemnity. Even if we lose on the contract indemnity claim, we think the district court was in error in denying or granting summary judgment against us on equitable indemnity under the South Carolina case law. We believe we have a significant relationship. We have a contract, which our courts recognize, I believe, implicitly as a special relationship, and we meet the requirements of an equitable indemnity claim if our contract claim is thrown out. And under the equities of this case, we were joined in this lawsuit only because Young Life's operator made the tragic error of not connecting the young girl to the swing. But for that error, we would not have been sued. And so we believe we meet the requirements for equitable indemnity in the alternative, even if we lose on the contract indemnity. That would be applying South Carolina law. And that's right. The district judge correctly determined that that's governed by South Carolina law without question. There's no dispute about that, right? The application of South Carolina law to the equitable indemnification claim? There's no dispute about that. There is no dispute about that. Let me ask you about that because the cases in South Carolina, I think you would agree, apply this equitable principle in fairly traditional circumstances. You have a master servant or, in the case of the contractor who was hired by a landlord to do some work on a building and he does something which causes the building to burn down. But in this case, the contract essentially between you and Young Life was over. I mean, the swing had been constructed. The work had been done. So what relationship is there once the contract is performed? I'm having a hard time seeing how that applies. That so-called special relationship. Well, I think you just have to have one at the time of the sale of the good involved here. I don't think it has to continue into the future. Most of these cases, the relationship does not continue into the future. It's over and done with. And then there is an accident or an injury or some contract damage and a lawsuit is filed. That's the scenario in all these cases. Well, as I understand the district court's analysis, there was no, as he put it, no action that flowed through from Young Life to you or maybe it was the other way around that he found was a requirement in these other South Carolina cases. Well, he adopted the flow-through language that Young Life suggested. That's not found in any single South Carolina case on equitable indemnity. That's a made-up term by Young Life. Just like a couple of our courts mentioned directed at, but the rest of the courts don't. But here in this case, Young Life's mistake, and of course we have a contractual arrangement with Young Life to use the swing properly. They breached that contract and by reason of that got us sued by this girl's parents after she died. To me, it's just as plain as the nose on your face that what Young Life did classically satisfies the situation where they placed us in a position where we were required to defend ourselves and but for their wrongful conduct, we would not have been put in that position. Therefore, under our case law, Griffin versus Van Norman, the rest of them, we're entitled to recover whatever expenses we incur to defend the case plus whatever reasonable settlement we may make to avoid the lawsuit. If there are no further questions, I believe my time is up. Thank you very much. Thank you, Mr. Boyd. Mr. Strach? May it please the court, Jack Strauch on behalf of Young Life. This contract between InterQuest and Young Life was entered into for one purpose, one purpose only, and it's clearly articulated in the record. Young Life hired InterQuest for its construction services because Young Life wanted a swing that was constructed to the demanding ACCT standards, Association for Challenge Course Technology, which Young Life viewed as the gold standard in safety in the challenge course world. Young Life, the testimony is unrebutted, absolutely unequivocal. Young Life knew how to build one of these swings, knew all of the components of these swings, had these swings at multiple other camps around the country. And there is one reason and one reason only that they decided to hire InterQuest to construct the swing instead of any general contractor, Joe's contractor. And that is because InterQuest was known as an ACCT certified member who could build the swing to those standards. And the contract provided that it would be constructed to those standards. So under your theory of the case, it matters not how the breakdown occurred with respect to cost? Oh, it does matter. It is a factor. There's no question it is one of the three factors. Contract language is the first factor under the Coakley and Williams case. The nature of the business of the supplier is the second factor, and the breakdown, the intrinsic worth of the materials, the breakdown of the costs is the third factor. So with respect to that, your opponent says that the district court was just completely wrong in terms of its math, I suppose. No. I understand that that's what Mr. Boyd says. The district court did not make any ruling with respect to the cost of the materials. If you look at JA408, that is the page from the district court opinion, where the district court explains that Young Life contended that the cost of the materials was $12,000. That InterQuest contended something different without providing any evidence. The court said at that page, because InterQuest has not provided any further breakdown of the component and labor costs for the support poles and swing bar, the court can only speculate as to the intrinsic value of these components, and the court refused to speculate. The court, with respect to that third factor, said it doesn't weigh in either direction, as a services contract or as a sale of goods contract. And, in fact, in its order denying the motion for reconsideration, the court made it very clear that it only had ruled on two of the factors, the first two, the language of the contract and the nature of the business of the supplier. The language of the contract could hardly be more clear that this is a construction contract. We have cited the language throughout our brief, but to highlight some of this, it says that what InterQuest was going to do was to construct the challenge course. It provides approximate construction dates. It states that InterQuest cannot schedule construction without a contract. It describes the project covered by the contract, not the sale of goods, but a project covered by the contract. It speaks to a pre-construction site visit. It speaks to marking and clearing property lines prior to construction. It speaks to further clearing operations to, quote, facilitate construction. It talks about who is going to be responsible for removing construction debris. It talks about a site survey being done prior to construction. I'm quoting from the contract here. I'm not paraphrasing. It says this about scheduling the construction, which lasted three days. InterQuest is always very busy building courses and conducting training. No construction can be scheduled without a contract, and jobs are added to our schedule in the order of time the contracts are signed. It talks about who is going to be fed, who is going to be lodged, the construction crew, where they're going to be fed and lodged during the multi-day construction. It provides for progress payments, which happen in construction contracts. It talks about who is responsible for getting local building permits and building inspections. It talks about who has responsibility for liability insurance during the performance of the project, which, of course, is the construction. Against all of that language and against the unrebutted, very clear testimony that Young Life went to InterQuest precisely for its construction skills for ACCT standards, against the fact that InterQuest has a contractor's license and touted that fact, the language of the contract that InterQuest holds up is it uses the word buy in what is essentially an advertisement section of this standard form contract where they're trying to sell additional services beyond construction, such as training services and routine yearly inspection. You've got to get these big pieces of equipment expected on a yearly basis. They're trying to sell those services. That's the entirety of the language. Nowhere in here is Young Life referred to as the buyer or InterQuest as the seller. Instead, InterQuest is referred to as the contractor. In discovery, quite importantly, InterQuest described itself in interrogatory answers as, quote, the seller and supplier of the components of the swing. It wasn't until InterQuest saw that North Carolina law invalidated this indemnity provision that InterQuest, to their credit of the creativity of their lawyers, came up with this argument that this is actually a contract for the sale of a good. The language of the contract I submit could hardly be more clear. I want to stress that is just one factor. That's the first factor. I would submit probably the most important factor because when we're interpreting contracts, trying to understand contracts, we're always looking to the language first, of course. I would submit that is the most important factor. The second factor that Judge Hurlong looked at and actually did decide, make decisions on, is the nature of the supplier's business. In a 30B6 deposition of the present proprietor of InterQuest, InterQuest explained that it has two divisions. One division designs, builds, and constructs swings and other challenge course equipment, like zip lines. The other division operates a zip line slash challenge course park. Those are the two divisions. Both of them are service oriented. So when you look at the language of the contract, it could hardly be more clear. When you look at the nature of InterQuest services, what they do, they have two divisions and both are service oriented, the first of which is focused on design and construction of challenge course equipment, like this giant swing, like zip lines, like other pieces of equipment like that. I think it's abundantly clear that the creativity of InterQuest Council notwithstanding, this is not a contract for the sale of goods. It is patently, in my view, a construction contract and it is therefore void and against public policy, the provision contained therein purporting to indemnify InterQuest against its own negligence. What about the claim of equitable indemnification, which frankly troubles me more than this UCC issue, because I'm having trouble exactly understanding what the South Carolina cases mean when they talk about a special relationship, because on the face of it, we have a contract here between the parties. That would seem to me to be more than sufficient to establish that relationship. What's wrong with that in this context? So I think that Your Honor hit the nail on the head, and I believe it was you, Judge Diaz, when you mentioned the fact that the contract between InterQuest and Young Life was over. The swing was built in April of 2015 and this horrible tragedy did not occur until July 13, 2015. The contract between these two parties here was over and done. What I believe the South Carolina cases show consistently when dealing with equitable indemnity is it has to be that if I have a contract with Your Honor or I am performing, doing something for Your Honor, it is while I am engaged in doing that, I harm a third person and you're innocent. In that circumstance, it's while I am dealing directly with you, not before, not after. While I'm dealing directly with you, I do something wrong that harms a third person. I think in that circumstance, the cases deem that that is a special relationship. It's not just the mere existence of a contract, especially with a contract over. The existence of a contract a year ago, two years ago, I think it has to do with, I'll call it malfeasance, while carrying out the task that you engage me to do or that I'm doing on your behalf. That fits, I believe, all of the cases. The Winnsboro case, Supreme Court case from 1992, where the town hired a contractor to build a sewer. Contractor hired a sub to build the filter system. The filter system was messed up. The sewer didn't work properly because the filter manufacturer didn't perform his obligation while he was engaged to do it. The general could have equitable indemnity against the sub. The Stuck case, which is the sale of the car. A sells a defective, it's actually a truck, A sells a defective truck to B. The truck crashes because of the defect. B, the buyer, can have a claim against the seller for indemnity because in that transaction between the two there was misfeasance, failed to disclose the latent defect, bad brakes. The Addy v. Bolton case, a very classic situation of an owner hiring a contractor. Contractor burns down the building of the owner, destroys the property of a tenant. While performing that job, the repair work, the contractor burned down the building. While that relation is happening, while the contractor is performing, engaged in negligence which caused the loss to the third party, there could be indemnity there. Stoneledge, Court of Appeals case from 2015, is just like the Winnsboro case. Owner hires contractor who hires sub. While sub is performing for contractor, messes up the stonework on a building and damages the building. In that situation, equitable indemnity could go forward. Every one of those cases, like the courts of the McCoy case, the Jordan v. Boggs case, every one of those cases, they're discussed in the brief, they're discussed in the district court's opinion, involve a situation, not to be too redundant, but involves a situation where while A is performing for B, A makes a mistake and injures a third party. None of these situations involve contracts that are over and done. InterQuest had cleaned up and walked away months before. On the occasion that Young Life was loading Olivia Grimes onto the swing, July 13, 2015, there was not anything being done for or in relation to InterQuest. That relationship was over. Did you argue this case in the district court? There was no oral argument in the district court. Okay. But you submitted the briefs? I did. Okay. I did. So the district court's language of the Wrongful Act flowing through the non-faulting party, was that your language? No, absolutely not. The first time I heard that was when I read the district court's opinion. I invite the court to take a look at the briefs we filed. Mr. Boyd and I have become good friends in the Corsas case. I know he was just mistaken when he said that. No doubt about that in my mind. But we did not suggest that language. But I actually think the language fits. The language that's used in the cases, it's used in the Supreme Court case of Winnesboro 2, is directed at. So the indemnitores negligence must be directed at the indemnity and harm the third party. I think it means the same thing as indemnitores negligence must flow through the indemnity and harm. I see them as synonymous. And, frankly, the flow through language seems to ring better than the directed at. I think they mean the same thing. And I believe that's what the district court was doing, was signifying that way, that the same thing as directed at. And InterQuest absolutely concedes that the negligence must be directed at the indemnity for there to be indemnity. They concede that flat out in its brief, in its opening brief, page 36, and its reply brief, page 6. And they cannot show that the negligence was directed at. The effort that is made is to claim that there was some post-contract obligation to operate the swing in a certain way. And that is in this advertising section, the last couple pages of the contract, where InterQuest is trying to sell services to Young Life, inspection services, et cetera, et cetera. And in there they say that Young Life should make sure that its instructors get basic level, I'm sorry, it's the people who run the swing, not instructors, operators, get basic level training. Well, it's undisputed that they got basic level training and actually higher than basic level training from another ACCT certified vendor member. That's what InterQuest tries to hang its hat on to try to claim that somehow, despite the fact that the contract was over and done, that Young Life supposedly directed negligence at InterQuest. The cases will not support that. Every one of them that I have read, every one of them cited in the district court's opinion and cited in the briefs below and here, all address the very classic situation, as Judge Diaz was talking about, of general contractor, subcontractor, master servant. And every one of those involves the indemnitor directing his negligence at the indemnity by failing to properly perform an engagement that's going on at that very time, which causes injury to a third party. Thank you. Thank you, sir. Mr. Boyd. Thank you, Your Honor, briefly in reply. As I mentioned in my opening, this is a standard contract InterQuest uses across the board for all of the work it does. One type of work it does is involved in constructing entire courses out in the woods for one of these challenge courses. It's not what we're involved with in this case. Here we're involved with the single sale of a three-person giant swing, which was installed at Carolina Point. None of the provisions that Mr. Stroud was just reading to the court applied here. We didn't do any of that. In fact, the site prep was actually done by Young Wife. All we did was design the swing, determine the components needed for it, bring those components to South Carolina, assemble the swing, and erect it at Carolina Point, period, flat, end of discussion. The standard contract just didn't have much applicability to exactly what was done here. And again, maybe I'm not a very good lawyer, we were defending a product liability case in this lawsuit. We were not defending a construction case. There was zero issue about the installation of the swing. The issue was the design of the swing. And by the way, Young Wife had specifically contacted InterQuest and asked InterQuest to sell them a swing just like one they had at another camp. So this was a discrete component of a challenge course that InterQuest made specifically for Young Wife at its request. Very briefly, and I apologize for my mistake on who came up with the flow-through analogy, but all that is required under South Carolina law for equitable indemnity is you have a contract or other special relationship, which we have here, and that you have been exposed by the wrongful act of another in which you did not join and forced to defend yourself in a lawsuit. That's all we need. And you look at all the cases, that's what most of them provide. I don't understand the argument that the relationship has to be ongoing at the time of the injury. Generally, it is over and done with. I had the misfortune of defending the Griffin v. Van Norman case, which went to our Court of Appeals. And in that case, the work done by the termite contractor was long over before the homeowners sustained the floor collapse. So there was no ongoing relationship there at all. It had been, just as it always is in these cases, but it doesn't need to be an ongoing contract at the time of the lawsuit, obviously. If there are no further questions, that concludes the reply that I would like to make. Thank you very much. Thank you, Mr. Boyd. We appreciate it. We'll come down and greet counsel, and then we'll take a short break. The Solvable Court will take a brief recess.
judges: Robert B. King, Albert Diaz, Henry F. Floyd